## INSURANCE COMPANY *v.* BOON.

1. Where the issues are tried by the court, its finding belongs to the record as fully as does the verdict of a jury.

2. Where the court tried the issues of fact, and its opinion, embodying its findings and the conclusions of law thereon, was filed concurrently with the entry of the judgment, but there was no formal finding of facts, and the court, at the next following term, upon a rule awarded, and, after hearing the parties, made an order that a special finding, with the conclusions of law conformable to that opinion so filed, be entered *nunc pro tunc*, and made part of the record as of the term when the judgment was rendered, — *Held*, that the order was within the discretion of the court, and that by it such special finding became a part of the record of the cause, and that the judgment upon it is, without a bill of exceptions, subject to review here.

3. A policy of insurance for one year, issued Sept. 2, 1864, upon certain goods then in a store at the city of Glasgow, Mo., contained the following stipulation : "*Provided always*, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power." At an early hour on the morning of the fifteenth day of October, 1864, an armed force of the rebels, under military organization, surrounded and attacked the city. It was defended by Colonel Harding and the forces of the United States under his command, and a battle between them and the rebel forces continued for many hours When it became apparent to Colonel Harding that the city could not be successfully defended, he, in order to prevent the military stores deposited in the city hall from falling into the possession of the rebel forces, set fire to the city hall. It, with its contents, was consumed. Without other interference, agency, or instrumentality, the fire spread to the building next adjacent to the city hall, and from building to building through two other intermediate buildings to the store containing the goods insured, and

destroyed them. During this time, and until after the fire had consumed such goods, the battle continued, and no surrender had taken place, nor had the rebel forces, nor any part thereof, entered the city. *Held*, that the fire which destroyed the goods was excepted from the risk undertaken by the insurers.

ERROR to the Circuit Court of the United States for the District of Connecticut.

This was an action commenced in September, 1868, to recover $6,000, the amount of a policy of insurance, bearing date Sept. 2, 1864, issued to the plaintiffs below by the Ætna Fire Insurance Company of Hartford, Conn., for one year, upon certain goods, wares, and merchandise then in their store at Glasgow, Mo., which were destroyed by fire Oct. 15, 1864.

By written stipulation, a jury was waived, and the issues of fact tried by the court.

On April 28, 1874, the court filed a written opinion declaring their finding of facts upon the evidence, with their conclusions of law thereon, and rendered judgment accordingly for the plaintiffs. No other findings of fact were had, nor was a bill of exceptions tendered at that time. On the 13th of July following, the defendant applied to the circuit judge in vacation for a rule on the plaintiffs to show cause why the findings of fact and the conclusions of law thereon should not be stated by the court, and a bill of exceptions signed and filed *nunc pro tunc*. Leave for that purpose having been granted, execution of the judgment was stayed. August 22, the parties stipulated in writing that the rule should be heard before the district judge at chambers. Upon the hearing, he, on the twenty-fourth day of that month, granted the rule. At the September Term of the court, the findings of fact and conclusions of law thereon were duly entered *nunc pro tunc* as of the April Term, and the bill of exceptions was signed by both judges. The findings, so far as they involve any question argued by counsel here, are as follows: —

"That the policy, which was duly executed by the defendant and delivered to the plaintiffs, contained the following express provisions, annexed to the agreement of insurance and in the body of the policy, namely: —

"*Provided always*, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which

may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire."

That the facts and circumstances showing the cause of the fire are as follows, namely: At and before the time of the fire in question, the city of Glasgow, within which the said store of the plaintiffs was situated, was occupied as a military post of the United States, by the military forces and a portion of the army of the United States engaged in the civil war then, and for more than three years theretofore, prevailing between the government and the citizens of several Southern States who were in rebellion and seeking to establish an independent government, under the name of the Confederate States of America. As such military post, the said city of Glasgow was made the place of deposit of military stores for the use of the army of the United States, which stores were in a building called the city hall of the said city of Glasgow, situated on the same street, on the same side of the street, and about one hundred and fifty feet distant from the plaintiffs' said store, three buildings, nevertheless, being located in the intervening space, not, however, in actual contact with either. Colonel Chester Harding, an officer of the United States government, and in command of the military forces of the United States, held the possession of the said city, and had lawful charge and control of the military stores aforesaid. On the fifteenth day of October, 1864, an armed force of the rebels, under military organization, surrounded and attacked the city at an early hour in the morning, and threw shot and shell into the town, penetrating some buildings, and one thereof penetrating the said store of the plaintiffs, but without setting fire thereto or causing any fire therein, and some of said shell killing soldier and citizens. The city was defended by Colonel Harding and the military forces under his command, and battle between the loyal troops and the rebel forces continued for many hours. The citizens fled to places of security, and no civil government prevailed in the city. The rebel forces were superior in numbers, and, after a battle of several hours, drove the forces of the government from their position, compelled their surrender, and entered and occupied the city.

During the battle, and when the government troops had been driven from their exterior lines of defence, it became apparent to Colonel Harding that the city could not be successfully defended, and he thereupon, in order to prevent the said military stores from falling into the possession of the said rebel forces, ordered Major Moore, one of the officers under his command, to destroy them.

In obedience to this order to destroy the said stores, and having no other means of doing so, Major Moore set fire to the said city hall, and thereby the said building, with its contents, was consumed. Without other interference, agency, or instrumentality, the fire spread along the line of the street aforesaid to the building next adjacent to the city hall, and from building to building through two other intermediate buildings to the store of the plaintiffs, and destroyed the same, together with its contents, including the goods insured by the defendant's policy aforesaid. During this time, and until after the fire had consumed such goods, the battle continued, and no surrender had taken place, nor had the forces of the rebels, nor any part thereof, obtained the possession of or entered the city.

It was conceded that the order of Colonel Harding was, in the exigency, a lawful and discreet use of the military authority vested in him.

The court declared, as conclusions of law upon the facts found, that the defendant was not exempted by virtue of the said proviso from liability to the plaintiffs under said policy, and that the plaintiffs were entitled to judgment for $6,000, the value of the property destroyed, with interest thereon from July 1, 1865, and costs of suit.

On the 7th of October, 1874, the defendant sued out this writ of error.

*Mr. Francis Fellowes* for the defendants in error, in support of the judgment below.

The record presents no question which can be reviewed here, as the court below had no jurisdiction of the cause after the close of the term at which the judgment was rendered. *Sheppard* v. *Wilson*, 6 How. 275; *Turner* v. *Yeates*, 16 id. 14; *Walton* v. *United States*, 9 Wheat. 657; *Muller* v. *Ehlers*, 91 U. S.

249; Phillip's Practice, 122, 123, 127; 3 Bl. Com. 275, 316; Petersdorff's Abridgment, tit. Amend. 504; *Albers* v. *Whitney*, 1 Story, 310; *Brush* v. *Robins*, 3 McLean, 487; *Carman* v. *Roberts*, 3 Wheat. 591; *Bank of The United States* v. *Massachusetts*, 6 How. 31.

But, if the findings can be considered a part of the record, it is submitted the loss in question must be attributed to its proximate cause, *Gen. Mutual Insurance Co.* v. *Sherwood*, 14 How. 352; *Insurance Company* v. *Tweed*, 7 Wall. 44; *Welts* v. *Conn. Mutual Life Insurance Co.*, 48 N. Y. 34; and that is the cause next preceding the effect, and capable of producing it. In this case, this cause was clearly the act of Colonel Harding in setting fire to the city hall; and no other cause "intervened between this act and the fact accomplished." Invaders, persons in insurrection, riot, or civil commotion, did not set the fire, nor have any part in the destruction of the insured property. The destruction was adverse to their interest. They took the town, but destroyed nothing.

The so-called military necessity is not named in the contract as a cause of exception. Besides, it had, in itself, no causal power. Furnishing a motive for, and in this sense an antecedent to, the act of Colonel Harding, it had nothing to do with causation.

His act was not that of a military or usurped power. Power, in itself, means simply *power*, not lawful authority. Military power is not lawful military authority, but rests upon mere force of arms, and must, therefore, of necessity be usurped. The word "or" in the proviso of the policy is used as conjunctive, not as disjunctive. It means both military and usurped. It is used to express equivalents. Thus, the exceptions signify that any loss happening by means of any military power, *or*, which is the same thing, of any usurped power, shall be excepted. *Or* is often so used. Thus we say a thing is a square, *or* a figure under four equal sides and angles. And the policy says, loss *or* damage, goods *or* merchandise, happen *or* take place, military *or* usurped.

This construction is sustained by the implied antithesis.

Military has its antithesis in civil; military power, in civil power.

The words " military or usurped power " were first in-
troduced into policies of insurance in Great Britain soon after
the Rebellion of 1715.   They referred to the power. of the
Pretender, and not to any lawful military authority or power
of the realm.    Ellis, Ins. 41 ; Park, Ins. 657 ; Marsh. Ins. 791.
Prior to that time, the exceptions were " fire occasioned by
invasion and foreign enemy."   The framers of them seem to
have considered either invasion or foreign enemy as a mili-
tary power, and then, lest they might not be comprehensive
enough to embrace domestic rebels, like the Pretenders and
their followers, " *any* military or usurped power whatsoever "
was added.   Manifestly, " military " and " usurped " were sy-
nonymous.   1 Bell, Com. 672.   The courts of Great Britain
and of this country treat them as signifying rebellion con-
ducted by authority.   *Drinkwater* v. *The London Assurance
Co.*, 2 Wilson, 363 ; *Langdale* v. *Mason*, 2 Marsh. L.s. 791 ;
*City Fire Insurance Co.* v. *Corlies*, 21 Wend. (N. Y.) 367 ;
*Sprull* v. *North Carolina Mut. Life Insurance Co.*, 1 Jones
(N. C.), 126 ; *Harris* v. *York Insurance Co.*, 50 Penn. 341.
And the parties to the contract are bound by the settled judicial
construction of the words.   *City Fire Insurance Co.* v. *Corlies,
supra.*

The maxim *noscitur a sociis* furnishes, in this case, the
true rule of interpretation.   Every other cause of exception
named in the proviso, " invasion, insurrection, riot, civil com-
motion," being unlawful, the words " military power," in the
same category, signify an unlawful military power, not the
lawful military authority of the country.   This observation
derives especial force from the fact that " military " stands
here in such close fellowship with " usurped."   Military *or*
usurped is the expression.   *Breasted* v. *The Farmers' Loan &
Trust Co.*, 8 N Y. 304 ; *Harper's Adm'rs* v. *Phœnix Insurance
Co.*, 19 Mo. 506 ; *Cluff* v. *Mut. Benefit Life Insurance Co.*,
13 Allen (Mass.), 308.

The act of Colonel Harding, so far from being the act of a
military or usurped power, was an act of civil jurisdiction,
whereby he asserted, in behalf of the nation, their paramount
title to the property, by virtue of the right of eminent do-
main.   *Mitchell* v. *Harmony*, 13 How. 113 ; *Grant* v. *United*

*States*, 1 Ct. Cl. p. 41; *Wiggin's Case*, 3 id. p. 412; *Harris* v. *York Insurance Co.*, 50 Penn. 341.

This, however, does not exempt the insurers from liability. But, on paying the loss, they are substituted to the rights of the insured.

If the destruction of the goods was not the intended consequence of the act of Colonel Harding, and, therefore, not a taking of private property for public use, but was accidental, it was one of those accidents the peril of which the insurers assumed. It was not thereby converted into the act of rebels, nor did it, therefore, happen by means of invasion, insurrection, riot, civil commotion, or of any military or usurped power.

The underwriters made their own exceptions, and the *onus* of proving the loss to be within the exceptions is on them. If, therefore, there is any ambiguity in the words employed, or any doubt as to the loss being within the exceptions, the principle of *fortius contra proferentem* furnishes the rule.

The obvious natural import of the words employed designates plainly the unlawful character of the causes excepted; the history of their first introduction into policies of insurance shows the nature of the risks intended to be excluded; and the subsequent adjudications of the meaning of the words render it certain that the words "military or usurped power" have no reference to acts of constitutional sovereignty, but are limited to acts of rebellion. The act of Colonel Harding, which caused the loss, was not an act of rebellion. The loss was not, therefore, excepted by the proviso.

*Mr. G. W. Parsons* and *Mr. R. D. Hubbard, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

Preliminary to any consideration of the assignments of error is the question whether the bill of exceptions and the special finding of facts can be considered as a part of the record. The issues formed by the pleadings were tried by the court, without the intervention of a jury, in September, 1873, and judgment for the plaintiffs was ordered at April Term, 1874. It does not appear that any exceptions were taken to the rulings of the court during the progress of the trial, and that which is now claimed to be a bill of exceptions has no reference to any such

rulings. It relates only to the judgment given on the findings of the issues of fact. The act of Congress which authorizes trials by the court, 13 Stat. 500, sects. 649, 700, Rev. Stats., has enacted that the finding of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury; and that, when the finding is special, the review by the Supreme Court upon a writ of error may extend to the determination of the sufficiency of the facts found to support the judgment. No bill of exceptions is required, or is necessary, to bring upon the record the findings, whether general or special. They belong to the record as fully as do the verdicts of a jury. If the finding be special, it takes the place of a special verdict; and, when judgment is entered upon it, no bill of exceptions is needed to bring the sufficiency of the finding up for review. But there must be a finding of facts, either general or special, in order to authorize a judgment; and that finding must appear on the record. In this case, there was no formal finding of facts when the judgment was ordered. It is to be inferred, it is true, from the judgment and from the entry of the clerk, that the issue made by the pleadings was found for the plaintiffs, but how, whether generally or specially, does not appear. There was, therefore, a defect in the record, which it was quite competent for the court to supply by amendment; and such an amendment was made. After the close of the April Term, and in the vacation next following, the judge of the court, on application of the defendants, granted an order upon the plaintiffs to show cause why the defendants should not have leave *inter alia* to make and serve a case or bill of exceptions, containing the evidence given at the trial, special findings of fact and law, and such exceptions thereto as the defendants might desire to make, and why such case or bill of exceptions when made and settled should not be filed, *nunc pro tunc,* as of the term when the judgment was entered. Upon this rule both parties were heard; and the result was an order that "a finding of facts in the cause, with the conclusions of the court thereupon, conformably to the opinion of the court theretofore filed," be prepared, to be approved by the court at the next following term (September); that the defendants have leave to prepare a bill of exceptions to be allowed and signed

at said term, and that "said special finding of facts" and bill
of exceptions should be made, allowed, and entered of record,
*nunc pro tunc,* as of the April Term, 1874, of the court.   Such
a special finding was accordingly prepared, and at the Sep-
tember Term signed by both the judges of the Circuit Court,
the order made in vacation was made the order of the court,
and the separate findings of fact and conclusions of law, to-
gether with the bill of exceptions, also signed, were ordered to
be filed, *nunc pro tunc,* as of April Term, 1874, and made part
of the record of the cause.   Had the court power to make such
an order respecting a special finding, and, if it had, does the
order have the effect of making the special finding a part of
the record?   It is not necessary to inquire whether the court,
at a term subsequent to the judgment, could lawfully allow and
sign a bill of exceptions not noted at the trial.   It may be
admitted that a court has no such power; but, as already re-
marked, no bill of exceptions was needed to bring any thing
upon the record.   If the special finding of facts was properly
there, or was rightfully supplied, the judgment of the court is
subject to review independently of any bill of exceptions, the
only office of which is to bring upon the record rulings that
without it would not appear.   It remains, therefore, to consider
whether the court could at the September Term, by an order,
correct the record by incorporating into it, *nunc pro tunc,* a
special finding of the facts upon which the judgment had been
rendered.   It is familiar doctrine that courts always have juris-
diction over their records to make them conform to what was
actually done at the time; and, whatever may have been the
rule announced in some of the old cases, the modern doctrine
is that some orders and amendments may be made at a subse-
quent term, and directed to be entered and become of record as
of a former term.   In *Rhoads* v. *The Commonwealth,* 35 Penn.
St. 276, Gibson, C. J., said: "The old notion that the record
remains in the breast of the court only till the end of the
term has yielded to necessity, convenience, and common sense.
Countless instances of amendment after the term, but ostensibly
made during it, are to be found in our own books and those of
our neighbors."   Even judgments may be corrected in accord-
ance with the truth.   It has been held by this court that, at

a subsequent term, when a judgment had before been arrested, an amendment may be made to apply the verdict to a good count, if another be bad, and the minutes of the judge show that the evidence sustained the good one. *Matheson's Adm'r* v. *Grant's Adm'r*, 2 How. 282. And this has been repeatedly held elsewhere. Generally, it may be admitted that judgments cannot be amended after the term at which they were rendered, except as to defects or matters of form; but every court of record has power to amend its records, so as to make them conform to and exhibit the truth. Ordinarily, there must be something to amend by; but that may be the judge's minutes or notes, not themselves records, or any thing that satisfactorily shows what the truth was. Within these rules, we think, was the order made at September Term, that the special finding of facts and conclusions of law be signed by the judges and allowed, conformably to the opinion of the court theretofore filed, and that it, together with the order, should be filed *nunc pro tunc* as of April Term, and made part of the record. It was but an amendment or correction of form, the form of the finding, not of its substance, and there was enough to amend by. The opinion, which was filed concurrently with the entry of the judgment, contained substantially, almost literally, the same statement of facts, and relied upon it as the foundation of the judgment given. True, that opinion is no part of the record, any more than are a judge's minutes; but it was a guide to the amendment made, and it seems altogether probable it was intended to be itself a special finding of the facts. The order of September, 1874, recites that the court had at April Term filed, announced, and declared their findings of facts, with their conclusions of law thereupon, which findings and conclusions were embodied in the opinion of the court announced and filed in the cause. And all that was wanting to make it a sufficient special finding was that it was not entitled "finding of facts." The amendment or correction, therefore, contradicts nothing in the record as made at April Term, and it is in strict accordance with the truth. We conclude, then, that the order of September Term was within the discretion of the court, and that by it the special finding returned became a part of the record of the cause, and that the judgment founded upon

it is subject to review in this court without any bill of exceptions.

In so holding, we do not depart from any thing we have ever decided respecting the power of a court to make up a case, after the expiration of a term, for bills of exceptions not claimed at the trial. This is not a case of that kind. It is the case of a correction of the record, not merely an allowance of exceptions never taken, and necessary to have been taken, to bring an interlocutory ruling upon it. We hold now, as we have always holden, that when bills of exceptions are necessary to bring any matter upon record so that it can be reviewed in error, it must appear by the record that the exception was taken at the trial. A judge cannot afterwards allow one not taken in time. Could he allow it, the record would be made to speak falsely.

Coming, then, to the merits of the case, the main question is, whether the fire which destroyed the plaintiff's property "happened or took place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power." If it did, the loss was excepted from the risk taken by the insurers.

The policy contains this express stipulation: " Provided always, and it is hereby declared, that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire." The general purpose of this proviso is clear enough, but there is controversy respecting the extent of the exemption made by it. It has been very strenuously argued that the words " military or usurped power " must be construed as meaning military *and* usurped power; that they do not refer to military power of the government, lawfully exercised, but to usurped military power, either that exerted by an invading foreign enemy, or by an internal armed force in rebellion, sufficient to supplant the laws of the land and displace the constituted authorities. There is, it must be admitted, considerable authority, and no less reason, in support of this interpretation. In our view of the present case, however, we are not called upon to affirm positively that such is the true meaning of the words in the connection in which they were used in the policy now under review; for, if it be con-

ceded that it is, we are still of opinion that the fire which de-stroyed the premises of the plaintiffs below "happened," "took place," or occurred by means of a risk excepted in the policy. In other words, it was caused by invasion, and the usurped military power of a rebellion against the government of the United States, as the contracting parties understood the terms " invasion " and " military or usurped power."

Policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. This is entirely consistent with the rule that ambiguities should be construed most strongly against the underwriters, and most favorably to the assured. *Manhattan Insurance Co.* v. *Stein,* 5 Bush (Ky.), 652. It was well said recently by the New York Court of Appeals, that, in construing contracts, words must have the sense in which the parties understood them. And, to under-stand them as the parties understood them, the nature of the contract, the objects to be attained, and all the circumstances must be considered. *Cushman* v. *United States Life Insurance Co.,* 6 Law Jour., p. 601.

Apply, now, these principles to the present case. The policy was issued in 1864, while the country was convulsed by a civil war. The property insured was in a State bordering upon sec-tions, the people of which were in insurrection against the general government, and confederated as a usurping power. The State had been the theatre of civil commotion and of armed invasion during the struggle between the confederated States and the Federal government, a struggle not then ended. It was quite possible that new invasions might be made and new destruction of property might be caused by the military or usurped power then in rebellion. It is evident that the insurers were willing to assume only ordinary risks, and that, to guard against more extended liability, the excepting clause was introduced into the policy. The provision must have been intended to be a protection to the company against extraordi-nary risks, attendant upon the condition of things then existing. Invasion involved, of necessity, resistance by the constituted authorities of the government, and the employment of its mili-tary force. Destruction of property by fire was quite as likely

to be caused by resistance to the usurping military power as by the direct action of that power itself. This must have been foreseen and considered when the insurance was effected.. It is difficult, therefore, to believe that the parties intended to confine the stipulated exemption within the limits to which the assured would now confine it. That the destruction of the plaintiff's property by fire was a consequence of the attack of the organized rebel military forces upon the forces of the United States holding possession of Glasgow, the special find-ing of facts clearly shows. Glasgow was a military post, and a place of deposit for the military stores of the United States, which were in the city hall. The city was guarded and de-fended by a military force under the command of Colonel Harding.

At an early hour of the morning of the fifteenth day of October, 1864, an armed force of the rebels, under military organization, surrounded and attacked the city and threw shot and shell into it, penetrating some buildings, and one thereof penetrating the store of the plaintiffs, but without setting fire thereto or causing any fire therein, and some of the shell kill-ing soldiers and citizens. The city was defended by Colonel Harding and the military forces under his command, and a battle between the loyal troops and the rebel forces continued for many hours. The citizens fled to places of security, and no civil government prevailed in the city. The rebel forces were superior in number, and drove the forces of the government from their position, compelled their surrender, and entered and occupied the city.

During the battle, and when the government troops had been driven from their exterior lines of defence, it became apparent to Colonel Harding that the city could not be successfully defended, and he thereupon, in order to prevent the said mili-tary stores from falling into the possession of the rebel forces, ordered Major Moore, one of the officers under his command, to destroy them.

In obedience to this order to destroy the said stores, and having no other means of doing so, Major Moore set fire to the city hall, and thereby the said building, with its contents, was consumed. Without other interference, agency, or instrumen-

tality, the fire spread along the line of the street aforesaid to the building next adjacent to the city hall, and from building to building through two other intermediate buildings to the store of the plaintiffs, and destroyed the same, together with its contents, including the goods insured by the defendant's policy aforesaid. During this time, and until after the fire had consumed such goods, the battle continued; and no surrender had taken place, nor had the forces of the rebels, nor any part thereof, obtained the possession of or entered the city.

In view of this state of facts found by the court, the inquiry is, whether the rebel invasion or the usurping military force or power was the predominating and operative cause of the fire. The question is not what cause was nearest in time or place to the catastrophe. That is not the meaning of the maxim *causa proxima, non remota spectatur.*

The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster. A careful consideration of the authorities will vindicate this rule. Mr. Phillips, in his work on Insurance, sect. 1097, in speaking of a *nisi prius* case of a vessel burnt by the master and crew to prevent its falling into the hands of the enemy, *Gordon* v. *Rimmington*, 1 Camp. 123, says, the "maxim *causa proxima spectatur* affords no help in these cases, but is, in fact, fallacious ; for if two causes conspire, and one must be chosen, the more scientific inquiry seems to be, whether one is not the efficient cause, and the other merely instrumental or merely incidental, and not which is nearer in place or time to the consummation of the catastrophe." And again, in sect. 1132 : " In case of the concurrence of different causes, to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or is not in activity at the consummation of the disaster." In *Brady* v. *North-western Insurance Co.*, 11 Mich. 425, Martin, C. J., in delivering the opinion of the court, said : " That which is the

actual cause of the loss, whether operating directly or by putting intervening agencies, the operation of which could not be reasonably avoided, in motion, by which the loss is produced, is the cause to which such loss should be attributed." In *St. John* v. *American Mutual Insurance Co.*, 11 N. Y. 519, the insurance was against fire, but the policy exempted the insurers from any loss occasioned by the explosion of a steam-boiler. A fire occurred, caused by an explosion, which destroyed the insured property. The court, regarding the explosion, and not the fire, as the predominating cause of the loss, held the insurers not liable. Decisions are numerous to the same effect. Policies of insurance do not protect an assured against his voluntary destruction of the thing insured. Yet in *Gordon* v. *Rimmington*, *supra*, it was held that, when the captain of a ship insured against fire burned her to prevent her falling into the hands of the enemy, it was a loss by fire within the meaning of the policy. It was because the fire was caused by the public enemy. The act of the captain was the nearest cause in time, but the danger of capture by the public enemy was regarded as the dominating cause. *Vide* also Emerigon, tom. i. p. 434. And we find the same principle followed in common practice. Often, in case of a fire, much of the destruction is caused by water applied in efforts to extinguish the flames. Yet it is not doubted all that destruction is caused by the fire, and insurers against fire are held liable for it. In *Lynd* v. *Tynsboro'*, 11 Cush. (Mass.) 563, where it appeared that a traveller had been injured by leaping from his carriage, exercising ordinary care and prudence, in consequence of a near approach to a defect in a highway, the town was held liable, though the carriage did not come to the defect. The defect was regarded as the actual, the dominating, cause. And in this court similar doctrine has been asserted. *Insurance Company* v. *Tweed*, 7 Wall. 44, the principle of which case, we think, should rule the present. There it was, in effect, ruled that the efficient cause, the one that set others in motion, is the cause to which the loss is to be attributed, though the other causes may follow it and operate more immediately in producing the disaster.

In *Butler* v. *Wildman*, 3 B. & A. 398, may be found a case where the captain of a Spanish ship, in order to prevent a

quantity of Spanish dollars from falling into the hands of an enemy by whom he was about to be attacked, threw them into the sea. The suit was upon a policy insuring the dollars, and judgment was given for the plaintiff. Bayley, J., said, " It was the duty of the master to prevent any thing which could strengthen the hands of the enemy from falling into their possession. Now, as money would strengthen the enemy, it was the duty of the master to throw it overboard; and the sacrifice of the money was, therefore, *ex justa causa.* It seems to me, therefore, this is a loss by jettison. But it is not a loss by jettison: it is a loss by enemies. It clearly falls within the principle stated by Emerigon, in the case of the destruction of a ship by fire; and I think the enemy was the proximate cause of the loss." Holroyd, J., said, " It seemed to him it was a loss by enemies, for the meditated attack was the direct cause of the loss." A similar doctrine was asserted in *Barton* v. *The Home Insurance Co.*, 42 Mo. 156; and in *Marcy* v. *Merchants' Mutual Insurance Co.*, 19 La. Ann. 388. It is a doctrine resting upon reason, and in accord with the common understanding of men. Applying it to the facts found in the present case, the conclusion is inevitable, that the fire which caused the destruction of the plaintiffs' property happened or took place, not merely in consequence of, but by means of, the rebel invasion and military or usurped power. The fire occurred while the attack was in progress, and when it was about being successful. The attack, as a cause, never ceased to operate until the loss was complete. It was the *causa causans* which set in operation every agency that contributed to the destruction. It created the military necessity for the destruction of the military stores in the city hall, and made it the duty of the commanding officer of the Federal forces to destroy them. His act, therefore, in setting fire to the city hall, was directly in the line of the force set in motion by the usurping power, and what that power must have anticipated as a consequence of its action. It cannot be said that was not anticipated which military necessity recognized. And the insurers and the assured must have looked for such action by the Federal forces as a probable and reasonable consequence of an overpowering attack upon the city by an invading rebellious force. Having excepted

from the risk undertaken responsibility for such an attack, they excepted with it responsibility for the consequences reasonably to be anticipated from it.

The court below regarded the action of the United States military authorities as a sufficient cause intervening between the rebel attack and the destruction of the plaintiffs' property, and therefore held it to be the responsible proximate cause. With this we cannot concur.

The proximate cause, as we have seen, is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. In *Milwaukee & Saint Paul Railway Co.* v. *Kellogg,* 94 U. S. 469, we said, in considering what is the proximate and what the remote cause of an injury, " The inquiry must always be whether there was any intermediate cause *disconnected from the primary fault,* and self-operating, which produced the injury." In the present case, the burning of the city hall and the spread of the fire afterwards was not a new and *independent* cause of loss. On the contrary, it was an incident, a necessary incident and consequence, of the hostile rebel attack on the town, — a military necessity caused by the attack. It was one of a continuous chain of events brought into being by the usurped military power, — events so linked together as to form one continuous whole. The case is, therefore, clearly within the doctrine asserted by Emerigon, and held in *Butler* v. *Wildman,* and in the other cases we have cited.. Hence it must be concluded that the fire which destroyed the plaintiffs' property took place by means of an invasion or military or usurped power, and that it was excepted from the risk undertaken by the insurers.

*Judgment reversed and record remitted, with instructions to enter judgment for the defendant below.*

MR. JUSTICE CLIFFORD, MR. JUSTICE MILLER, and MR. JUSTICE FIELD dissented.

MR. JUSTICE CLIFFORD. Parties in civil cases pending in the Circuit Court, or their attorneys of record, may file a stipulation in writing with the clerk of the court, waiving a jury; and,

whenever they do so, the issues of fact in the case may be tried and determined by the court without the intervention of a jury.

Where a jury is waived and the issues of fact are submitted to the court, the finding of the court may be either general or special, as in cases where an issue of fact is found by a jury; but where the finding is general, the parties are concluded by the determination of the court, except in cases where exceptions are taken to the rulings of the court in the progress of the trial.

Such rulings, if duly presented by a bill of exceptions, may be reviewed here, even though the finding is general; but the finding of the court, if general, cannot be reviewed in this court by bill of exceptions, or in any other manner, as the act of Congress provides that the finding "shall have the same effect as the verdict of a jury" in a case where no such waiver is made. 13 Stat. 501; *Insurance Company* v. *Folsom*, 18 Wall. 237; *Norris* v. *Jackson*, 9 id. 125; *Insurance Company* v. *Sea*, 21 id. 138; *Copelin* v. *Insurance Company*, 9 id. 461.

Facts found by a jury could only be re-examined under the rules of the common law, either by the granting of a new trial by the court where the case was tried or to which the record was returnable, or by the award of a *venire facias de novo* by the appellate court for some error of law which intervened in the proceedings. *Parsons* v. *Bedford*, 2 Pet. 448; 2 Story, Const., sect. 1770.

Nothing, therefore, is open to re-examintion in such a case, except such of the rulings of the court made in the progress of the trial as are duly presented by a bill of exceptions.

When a court sits in the place of a jury, and finds the facts, this court cannot review that finding. If there is any error in such a case, shown by the record, in admitting or rejecting testimony, it can be reviewed here; but when the court, by permission of the parties, takes the place of the jury, its finding of facts is conclusive, precisely as if a jury had found them by verdict. *Basset* v. *United States*, 9 Wall. 38.

Matters of fact under such a submission must be found by the Circuit Court and not by the Supreme Court, as the act of Congress provides that the issues of fact may be tried and determined by the Circuit Court where the suit is brought.

Goods and merchandise deposited in a two-story brick store-

house, to a large amount, were owned by the plaintiffs; and they procured the storehouse and the goods to be insured by the defendants against loss or damage by fire, in the company of the defendants, to the amount of $6,000, to be paid within sixty days after notice and proof of loss made by the assured, in conformity with the conditions of the policy, subject to the proviso that the company shall not be liable to make good any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power, or any loss by theft at or after a fire.

On the 15th of October, 1864, the storehouse, with the goods insured, was consumed by fire, as is more fully explained in the transcript. Payment of the loss being refused, the plaintiffs instituted the present suit. Service was made; and the defendants appeared and pleaded the general issue, with notice of special matter to be offered under that plea. Pursuant to the act of Congress, the parties filed a stipulation in writing with the clerk of the court, waiving a trial by jury; and the court proceeded to try and determine the issues of fact in the case, and the statement is, that the parties and their counsel were fully heard.

By the record, it also appears that the court, upon due consideration, "found the issues for the plaintiffs, and rendered judgment in their favor" for the sum of $9,177.50 damages and costs of suit; and that execution issued therefor. Superadded to that is the statement of the clerk, that, upon the rendering of said judgment, the opinion of the court was filed in said matter in the words and figures set forth in the printed transcript. Judgment was rendered on the 28th of April, 1874, and on the first day of June in the same year execution against the defendants was issued to the plaintiffs, which, on the 17th of August thereafter, was returned unsatisfied; and on the same day an *alias* execution was issued in their favor, which has not yet been returned.

Application was made to the circuit judge by the defendants, July 13, 1874, for leave to make a case, or bill of exceptions in the case, to contain the evidence given at the trial, special findings of fact and law to be signed by the court or one of the

justices who presided in the trial, and to contain such exceptions thereto as the defendants may desire to make ; and that the same, when made and settled, may be filed *nunc pro tunc* as of the term when the judgment was rendered, and for a stay of execution. Instead of granting the application, the circuit judge laid a rule on the plaintiffs or their counsel to show cause, on a day and at a place named, why the defendants should not have the leave requested in the application.

Subsequently the parties, by stipulation, changed the time and place for hearing the rule to show cause, and agreed that it might be heard by Judge Shipman, subject to the right of the plaintiffs to object to the jurisdiction of the court or any judge thereof to entertain such an application after the expiration of the term when the judgment was rendered. Due hearing was had before the district judge, and he passed an order to the effect following : that a finding of facts in the cause, with the conclusions of the court thereon, conformably to the opinion of the court heretofore filed, be prepared by the defendants and be submitted to the plaintiffs, to be approved and signed by the court at the September Term of the Circuit Court, to be holden at Hartford on the third Tuesday of September, 1874, and that the defendants have leave to prepare a bill of exceptions which shall be allowed and signed by the judge of said court at said term, which said special finding of facts and a bill of exceptions shall be made and allowed and entered of record *nunc pro tunc* as of the April Term, 1874, of said court, and that execution be stayed as therein provided.

In conformity with that order, the special finding of facts and the bill of exceptions exhibited in the transcript were, on the third Tuesday of September, signed, filed, and entered of record *nunc pro tunc* as of the previous April Term of the said court, in the words and figures specially set forth in the transcript. Just preceding the entry of the judgment, the record states that the court found the issues for the plaintiffs, and rendered judgment in their favor. Five months after that, the court allowed the defendants to prepare a special finding, and made an order that it be entered of record as of the day of the judgment rendered at the preceding term, in direct contradiction of the entry made at the judgment term.

Beyond all doubt, the finding which preceded the judgment, as set forth in the transcript, is *general*, and it is equally clear that the judgment was rendered on the 28th of April, in pursuance of that finding. What is now called the " finding of facts " and the bill of exceptions were filed at the next term of the court, which was held at Hartford the following September, nearly five months after the judgment was rendered. Both of those papers were filed and entered of record subject to the objections of the plaintiffs ; and the defendants sued out the present writ of error, and removed the cause into this court.

Two errors are assigned by the defendants, as follows : 1. That the court, instead of adjudging that the defendants were liable, should have decided that they were exempt from liability, by virtue of the proviso in the policy. 2. That the judgment, instead of being for the plaintiffs, should have been for the defendants.

Any discussion of the question touching the regularity of the bill of exceptions, or of any question therein raised, is wholly unnecessary, as the errors assigned do not present any question of the kind ; and, if they did, it is clear that no such question could be of any benefit to the defendants, for two reasons, either of which is conclusive against the defendants : 1. Because the record does not show that the defendants objected to any ruling of the court during the progress of the trial.

Repeated decisions of this court have settled the rule that the exception must show that it was taken and reserved by the party at the trial, but that it may be drawn out and signed or sealed by the judge afterwards. *United States* v. *Breitling*, 20 How. 252 ; *Dredge* v. *Forsyth*, 2 Black, 563 ; *Kellogg* v. *Forsyth*, 2 id. 571.

2. Because the bill of exceptions was neither made, signed, nor entered of record until the next term, nearly five months after the judgment was rendered. *Flanders* v. *Tweed*, 9 Wall. 425.

Unless it appears that the objection to the ruling of the court was taken at the trial, the bill of exceptions drawn up and signed subsequently to the judgment, if it has no other foundation than a ruling of the court not objected to at the time, cannot properly be regarded as a part of the record.

Tested by these considerations, it is clear that the questions presented in the paper called the bill of exceptions must be overruled, for the reason that the paper in question was never signed, filed, or entered of record in season to constitute a part of the record.

Suppose that is so, then it is clear that there is no proper bill of exceptions in this case. Concede that, and it follows that the paper called " finding of facts " is the only matter that remains for re-examination.

Even the defendants do not contend that the opinion of the court filed in the case, at the date of the judgment, is the special finding contemplated by the act of Congress empowering parties to waive a jury, nor do they deny that the general finding therein specified concludes the parties where there are no proper exceptions to the rulings of the court during the progress of the trial. Such a denial, if made, would be of no avail, as the act of Congress provides that the finding, whether general or special, shall have the same effect as the verdict of a jury; and every one knows that the seventh amendment provides that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law.

Confirmation of those views, if any be needed, is found in numerous decisions of this court, in which the very point as to the legal effect of a general finding of the Circuit Court is expressly adjudged and determined. *Cooper* v. *Omohundro*, 19 Wall. 65 ; *Crews* v. *Brewer*, id. 70 ; *Insurance Company* v. *Sea*, 21 id. 158.

Issues of fact in such a case may be tried and determined by the Circuit Court; and, if it be true that the general finding of the court shall have the same effect as the verdict of a jury, then it follows that the finding can only be re-examined either by a motion for a new trial in the court where the finding was made, or by the award of a *venire facias de novo* in the appellate court. When the finding is special, the review may also extend to the determination of the sufficiency of the facts found to support the judgment; but " if the jury is waived, and the court chooses to find generally for one side or the other, the losing party," says Mr. Justice Bradley, "has no redress, on

error, except for the wrongful admission or rejection of evidence." *Dirst* v. *Morris*, 14 id. 484.

Viewed in the light of these suggestions, it is clear that the general finding in such a case concludes the right of the parties, unless there is some proper exception to the ruling of the court in the progress of the trial.

Where the finding is general, nothing is open to review here except such rulings of the court in the progress of the trial as are duly presented in a bill of exceptions, and, even when the finding is special, the re-examination can only extend to the question whether the facts found are sufficient to support the judgment. Propositions of fact found by the Circuit Court in such a case are equivalent to a special verdict, and, consequently, are irreviewable here except for the purpose of determining the single question whether they are sufficient to warrant the judgment; nor is the Circuit Court required to make a special finding, as the act of Congress provides that the finding of the Circuit Court may be either general or special, giving the Circuit Court the same power in that regard as has always been possessed by a jury. *Insurance Company* v. *Folsom*, 18 Wall. 237; 1 Archb. Pr. (2d Am. ed.) 213; Co. Litt. 228 *b;* Litt., sect. 386; 3 Bl. Com. 378.

Exceptions are allowed to the rulings of the court in the progress of the trial, and the provision is, that the review, if the finding is special, may also extend to the determination of the sufficiency of the facts found to support the judgment; but if there be no exceptions to the rulings of the court in the progress of the trial, and no special finding of the facts, the judgment must be affirmed, as this court has no power to re-examine any question decided by the Circuit Court.

Sufficient has already been remarked to show that there is no valid bill of exceptions in the case, and that the paper in the record called "finding of facts" was not signed or filed until the next term after the general finding was made, and nearly five months after the judgment was rendered.

Redress here by writ of error can only be had when a party is aggrieved by some error in the foundation, proceedings, judgment, or execution of a suit in a court of record; and it is for that reason that the bill of exceptions is allowed, in order that

certain matters resting in parol may be incorporated into the record for the inspection of the proper appellate tribunal. *Suydam* v. *Williamson*, 20 How. 427.

Matters resting in parol, like the opinion of the court, are not a part of the record, and nothing therein contained can be assigned for error. *Williams* v. *Norris*, 12 Wheat. 118; *Davis* v. *Packard*, 6 Pet. 41; *Medbury* v. *State*, 24 How. 414.

Findings of fact in the form called special findings, like a special verdict, furnish the means of reviewing such questions of law arising in the case as respect the sufficiency of the facts found to support the judgment; but, where the finding is general, the losing party cannot claim the right to review any question of law arising in the case, except such as grow out of the rulings of the Circuit Court in the progress of the trial, which do not in any sense whatever include the general finding, nor the conclusions of the Circuit Court embodied in the general finding, as the general finding is in the nature of a general verdict, and constitutes the foundation of the judgment.

No review of a judgment in such a case can be made here under the writ of error, unless it is accompanied by a special finding or an authorized statement of facts, without imposing upon this court the duty of hearing the whole case, law and fact, as on appeal in equity or admiralty, which would operate as a repeal of the act of Congress authorizing parties to waive a trial by jury, and also would violate the provision of the Judiciary Act, which prohibits the Supreme Court from reversing any case " for any error in fact." 1 Stat. 85.

Three propositions are admitted by the plaintiffs, which it is important to bear in mind, as follows: 1. That no formal special finding was made, signed, or filed until the commencement of the Circuit Court at the next term after the judgment was rendered, when the paper called in the transcript " finding of facts " was signed, filed, and entered of record. 2. That it has been repeatedly decided by this court that the opinion of the court below does not constitute such a formal finding as that required in such a case. *Insurance Company* v. *Tweed*, 7 Wall. 44; *Dickinson* v. *The Planters' Bank*, 16 id. 250. 3. That the record shows that the opinion of the court was the only finding filed at the time the judgment was rendered, from which it is

suggested rather than argued that the judgment was unauthorized or irregular.

But the suggestion is entirely without merit, as neither the law nor justice requires that the general finding of the court shall be in writing. On the contrary, the conclusion may be orally announced, and the direction to the clerk to enter the judgment may also be oral. Nor is it correct to suppose that the statement in the transcript, that the court, upon due consideration, found the issues for the plaintiffs, is either unauthorized or without legal effect. What is stated in the conclusion of the opinion, to wit, that the plaintiffs are entitled to judgment for the amount of the insurance, would have been sufficient to authorize the clerk to enter judgment if the announcement had been oral instead of in writing, as it was, and it is abundantly sufficient, when taken in connection with the judgment and the statement immediately preceding it, to warrant the conclusion that the issues were duly found for the plaintiffs, and that the judgment in their favor is regular, and that it was duly recorded.

Power is vested in this court, where the finding is special, to inquire and determine, on writ of error, whether the facts found are sufficient to support the judgment; but a report of the evidence, without such special finding, will not give this court jurisdiction to re-examine that question; nor will the fact that the court below stated some of the facts in an opinion accompanying the judgment alter things in the least, it appearing that the facts exhibited in the opinion were stated, not as a special finding, but rather as a ground to show why the judge came to the conclusion set forth in the record. *Dickinson* v. *The Planters' Bank, supra.*

Argument to show that the facts exhibited in the opinion filed in the case, which are not stated as a special finding, are insufficient to give jurisdiction in such a case, is unnecessary, as that proposition is admitted by the defendants. Certain facts are stated in the opinion of the court which was filed in the case, but they are not stated as a special finding. Instead of that, they are merely facts advanced, as Mr. Justice Strong said in the case last cited, as reasons why the Circuit Court came to the conclusion that the plaintiffs were entitled to judgment for the amount of the insurance.

Grant all that, and still it is insisted by the defendants that it was entirely within the power and discretion of the Circuit Court to make the order in question at the time it was made, and to put the findings of the court into more formal shape ; but it is unfortunate for the defendants that the law is well settled the other way, nor do the authorities which the defendants cite, when properly applied, warrant any other conclusion.

Exceptions are prepared by the complaining party. Special findings are prepared by the court. Where the exception is duly taken and reserved at the trial, it may, in the discretion of the judge, be drawn out, and be signed or sealed by the judge afterwards. *United States* v. *Breitling*, 20 How. 252. Decided cases to the same effect are numerous.

It is a settled principle, say the court, in *Walton* v. *United States*, 9 Wheat. 651, cited by defendants, that no bill of exceptions is valid which is not for matter excepted to at the trial. We do not mean to say, remarked the court in that case, that the bill of exceptions should be formally drawn and signed before the trial is at an end. It will be sufficient if the exception be taken at the trial and noted by the court with the requisite certainty ; and, where that is done, it may be reduced to form, and be signed by the judge during the term. *Stanton* v. *Embry*, 93 U. S. 548.

Authorities of the kind give no support whatever to the proposition of the defendants, in view of the facts of the case as they appear in the transcript. Judgment was rendered for the plaintiffs in the usual course, without any intimation from the court that any special finding would be filed in the case, or any request being made by the defendants for such a finding; and the record shows that the plaintiffs in the mean time had taken out execution for the amount of the judgment. *Muller* v. *Ehlers*, 91 U. S. 249. Valid exceptions can never be allowed, unless taken at the trial ; and they will never be sustained, unless completed within the term.

Prompt action in respect to a statement of facts is also required ; and, here it appeared that nearly three months had elapsed from the rendition of the judgment before it was filed, this court held that it was an irregularity, for which the court

was bound to disregard it, and to treat it as no part of the record. *Flanders* v. *Tweed*, 9 Wall. 425.

Execution had issued in this case before the court granted the order that a special finding should be made, signed, and entered of record; and, inasmuch as the term in which the judgment was rendered had then expired, it is clear that the court below had not at that time any power to supply a special finding of facts. *Noonan* v. *Bradley*, 12 Wall. 121; *Washington Bridge Co.* v. *Stewart*, 3 How. 413; *Skillin's Ex'rs* v. *May's Ex'rs*, 6 Cranch, 267; *Ex parte Sibbald*, 12 Pet. 488; *Peck* v. *Sanderson*, 18 How. 42; *Martin* v. *Hunter's Lessee*, 1 Wheat. 304; *Roemer* v. *Simon*, 91 U. S. 149.

Support to the theory that the special finding, if any, in such a case should be prepared and filed before or at the time the judgment is rendered, is derived from the present rule of the Court of Claims. Prior to its adoption, the finding of facts in that court was sometimes prepared and filed subsequent to the rendition of judgment, which was not satisfactory. Dissatisfaction arising, this court adopted the rule that, in all cases in which either party is entitled to appeal to the Supreme Court, " the Court of Claims shall make and file their finding of facts and their conclusions of law thereon in open court before or at the time they enter their judgment in the case," which provision, it is believed, is universally approved by the legal profession; but the requirement is much greater where the special finding is made by the Circuit Court, for the reason that the act of Congress provides that the findings, whether general or special, shall have the same effect as the verdict of a jury, and no one ever supposed that the judgment might precede the return of the verdict on which it is required to be founded.

MR. JUSTICE MILLER concurred with MR. JUSTICE CLIFFORD.

MR. JUSTICE FIELD agreed with MR. JUSTICE CLIFFORD and MR. JUSTICE MILLER that there were no special findings in the record which the court could consider; but as the majority of the court reached a different conclusion, and held that the case was properly here on its merits, he was of opinion that the law was with the defendant below; — that the loss incurred was within the exception of the policy.