## DEPUE v. TRAVELERS' INS. CO.

(Circuit Court, E. D. Pennsylvania. January 5, 1909.)

### No. 98.

1. INSURANCE (§ 452*)—ACCIDENT INSURANCE—INJURY "IN PASSENGER ELEVATOR."

An elevator was standing at the first floor of a building, with the door, which extended to the roof of the elevator, wide open, the attendant being elsewhere. The car was operated by a lever on the side wall to the right of one entering the door, and, while the elevator was stationary, this lever was in the center of its arc of operation. In order to start the elevator it was necessary to push down a button at the center of the arc, which permitted the movement of the lever to the right or left. The elevator was in perfect condition, both before and after the accident, which no one saw. The building superintendent found insured hanging head downward into the elevator, her body caught between the roof

of the elevator and the floor of the building. One limb which had been caught at the thigh was projecting over the floor. When the elevator was released, insured fell into it on its floor. *Held*, that insured was "in" the elevator when the injuries were inflicted, within a policy insuring against accidental injury while "in" a passenger elevator.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 452.*]

2. INSURANCE (§ 529*)—ACCIDENT POLICY—EXTENT OF LIABILITY.

An accident policy insured D. according to a schedule providing that the principal sum for the year was $5,000, with 5 per cent. increase annually for 10 years (afterwards changed to 10 per cent. annually for 5 years) until it amounts to $7,500, each consecutive full year's renewal to add 5 per cent. (afterwards 10 per cent.) to the principal sum of the first year, until such additions shall amount to 50 per cent., and thenceforth, so long as the policy is in force, the insurance shall be for the original sums plus the accumulations. Attached to the policy was a rider insuring H. "as specified in the following schedule" to the amount of the original principal sum of the policy to which the supplement was attached. *Held*, that the limit of indemnity recoverable for the accidental death of H. was $5,000.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 529.*]

3. INSURANCE (§ 623*) — ACCIDENT POLICY—ACTIONS—TIME—WAIVER—DENIAL OF LIABILITY.

A provision of an accident policy that no action thereon shall be brought until three months after receipt of proofs of death at the home office of the company is waived by the insurer's denial of liability.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1551; Dec. Dig. § 623.*]

Burr, Brown & Lloyd, for plaintiff.
Frank P. Prichard, for defendant.

J. B. McPHERSON, District Judge. 1. The plaintiff's action is based upon a policy of accident insurance whereby the defendant agreed to pay him a certain sum of money if his mother, Mrs. Sarah M. Hope, should lose her life as the result of "bodily injuries effected directly and independently of all other causes, through external, violent and accidental means * * * while in a passenger elevator." It is conceded that she died from bodily injuries such as are described in the quoted clause, but it is denied that they were inflicted while she was "in a passenger elevator." The facts upon which this question arises are not disputed. They are thus stated in the brief of counsel for the defendant:

"The elevator was standing at the first floor of a building with the door, which extended to the roof of the elevator, wide open. The elevator attendant was not in the elevator, but attending to some duties elsewhere. · The elevator had for its operation a small lever on the side wall to the right as· one entered the door. While the elevator was stationary, this lever was in the center of its arc of operation. In order to start the elevator, it was necessary to push down a button at the center of the arc, which enabled the operator to move the lever, and then to move the lever either to the right or to the left. The elevator was in perfect condition before the accident, and was found to be in perfect condition after the accident. It continued to be used without repairs. No one saw the accident itself. Attracted by a noise, the superintendent of the building went to the elevator and found the insured hanging head downward into the elevator, her body caught between the roof of the elevator and the floor of the building. One leg, which had been caught at the thigh, was projecting over the floor. The superintendent

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

released the elevator, whereupon the insured fell into the elevator and upon its floor."

As both parties agreed, these facts present a question of law which is to be determined by the court. Was the decedent "in a passenger elevator" when the fatal injuries were inflicted? No decided case is directly in point, but the weight of analogous decision seems to me to favor an affirmative answer to the question. In the absence of testimony from eyewitnesses concerning the accident, several more or less plausible theories may be advanced to account for it. Thus the defendant's counsel suggests:

"For example, the insured might have been stepping into the elevator, and, when one foot was resting on the floor inside and one foot on the floor outside, she might have grasped the lever and started the mechanism. This is not probable, however, since in that case she would have inevitably been thrown forward by the starting of the elevator, and if one foot had been caught at all it would have been caught at the ankle and not at the thigh, the door being the whole height of the elevator.

"Or the insured, preparatory to stepping into the elevator, might have leaned forward and put her hand, to steady herself, on the operating mechanism which was at her right hand on the wall just beyond the door. In such case, if she had inadvertently started the elevator, she would have rested with her feet on the floor of the hall outside and her hand on the lever, and as the elevator descended she would have gradually been pulled over and her position reversed, in which case she might well have had one leg caught between the floor of the hall and the top of the door. That one leg would have been caught, and not two, would have been due to the fact that, as but one hand was resting on the lever, her body would have been supported from that side only, and might have swung over as the elevator descended. The only improbability about this hypothesis is that a lady well acquainted with elevators should intentionally use the lever as a support.

"Or the insured might have, in approaching the elevator, slipped and fallen into the doorway, and in falling thrown out her right hand and clutched the lever to save herself from falling, and thus started the elevator. This would as satisfactorily account for the position of the body as the last hypothesis, and avoids the improbability of an adult intentionally using the lever as a support. In the frantic clutch for the nearest support, the insured might well have pushed the button and moved the lever, and this would more satisfactorily account for the two motions than the more deliberate intentional use of the actuating apparatus as a support."

And the plaintiff's counsel adds the following theory:

"It will be remembered that no one saw the accident itself. The decedent was found immediately after the accident, under the uncontradicted evidence, jammed in between the roof of the elevator and the floor of the building, with her head and the greater part of her body within the shaft of the elevator, one leg being caught by the roof and being extended on the floor of the building. She was unable herself to explain the accident, but it is possible under the evidence that the injury occurred as she was stepping into the elevator, or that, having stepped in, her dress or the bundle that she was carrying in her hand caught the lever which started the elevator down. It seems perfectly clear under the testimony that at some stage Mrs. Hope's person or something that she carried must have pushed this lever, and the only doubt is whether this happened while she was getting in, or whether she had gotten in, and (being) within, having touched the lever and thereby started the elevator, tried to get out, with the unfortunate injury resulting. It is not believed that it makes a great deal of difference which inference is drawn from the testimony, though, if it does make any difference, attention is called to the probability of the latter explanation being the correct one, owing to the testimony of the janitor of the building with respect to the management of the elevator,

and the testimony with respect to Mrs. Hope's feeble walk; the combined effect of the testimony tending, as it seems to plaintiff's counsel, to show that she walked in with her small steps, and having got in rubbed against the lever, which was a foot or two inside the door, and then, when the elevator started to go down slowly, naturally tried to get out, without calculating just how long it would take. Clearly, however, Mrs. Hope was injured either while getting in, or while getting out, or while trying to get out of, the elevator."

Whichever of these theories is adopted, it seems to me that the decedent is fairly to be considered as "in the elevator" when the injuries were inflicted. How she reached that position seems to be unimportant. If she were injured while "in the elevator," she was under the express protection of the policy, and that the injuries were sustained while she was in that situation cannot, I think, be successfully disputed. It was the squeezing of her body between the roof of the elevator and the floor of the building that did the fatal harm, and this could only have been done after she had passed the threshold of the elevator, either wholly or in part, and had entered that conveyance.

The decisions that are usually cited in the discussion of similar questions are not fully harmonious, but there is less real divergence, I think, than is sometimes supposed. In Tooley v. Assurance Co., Fed. Cas. No. 14,098, the policy protected the insured while "actually traveling in a public conveyance," and it was held by Judge Drummond that the company was liable although the insured had left a railway car temporarily at a station, and was injured in the effort to board the train after it had started to pursue the journey. The fair construction of the contract was thought to be "that it included injuries received by the insured while necessarily getting on or off the train, as a traveler upon it." So, in Champlin v. Assurance Co., 6 Lans. (N. Y.) 71, it was ruled that a man was "traveling by public conveyance" who was attempting to board an omnibus, and was injured in the effort to secure and maintain a footing on the moving vehicle. The court said:

"Was the plaintiff traveling when the accident happened? He was in the act of getting into a public conveyance for that purpose, and was injured while upon the outside step thereof. It would be a very strained construction of a contract like this to hold that he was not traveling. If he was not traveling, it is difficult to say what he was doing. We think that, as he was actually going from one place to another, he was traveling."

And in Northrup v. Assurance Co., 43 N. Y. 516, 3 Am. Rep. 724, the same phrase was held to apply to the case of a person who was making a journey by connecting steamship and railway lines, and fell upon a slippery sidewalk while walking from the steamboat landing to the railway station. In construing the policy, the Court of Appeals used the following language:

"The policy must be construed so as to carry into effect the intention of the parties, so far as such intention can be determined from the language used, construed in the light of well-known extrinsic facts, which must be presumed to have been known to the contracting parties at the time of making the contract, and in reference to which it was entered into. One fact of this character, very important in the present case, is that of the frequent change required from one train of cars to another at intermediate stations upon the same journey. * * * An injury received while so necessarily walking in the actual prosecution of the journey is received while traveling by public

conveyance within the meaning of the policy, as such walking is the actual and necessary accompaniment of such travel. There is no difference in principle between a passenger so walking and the intestate in the present case."

Theobald v. Assurance Co., 10 Exch. 45, leans in the same direction. The policy there agreed to pay in case of injury happening to the assured from "railway accident" while "traveling in any class carriage," etc.; and it was held that, although the assured had arrived at his destination and was injured by slipping on the step of the carriage while in the act of alighting, he was nevertheless injured by "a railway accident" and was entitled to recover. The reasoning of Chief Baron Pollock identifies the traveler with the conveyance until he leaves it altogether and reaches the platform safely:

"On the present occasion it is quite plain that the plaintiff was a traveler on a railway; it is quite plain that, though at the time of the accident his journey had in one sense terminated by the carriage having stopped, he had not ceased to be connected with the carriage, for he was still in it. The accident also happened without negligence on his part, and while doing an act which, as a passenger, he must necessarily have done, for a passenger must get into the carriage and get out of it when the train is at the end, and cannot be considered as disconnected with the carriage and railway and with the machinery of motion until the time he has, as it were, safely landed from the carriage and got upon the platform. The accident is attributable to his being a passenger on the railway, and it arises out of an act immediately connected with his being such passenger. Under these circumstances we think this was a railway accident within the meaning of the policy."

It will be observed that the foregoing decisions were all made in suits brought to enforce the single liability which was the limit of the companies' obligation under the older forms of the policy. If this obligation could not be enforced, the company would escape altogether, and therefore, in furtherance of its presumed intent to afford indemnity unless such intent was clearly excluded by the words of the policy, every ambiguous phrase was construed in favor of the insured, and the circumstances surrounding the injury were looked upon with a similar disposition. But, when the companies began to introduce a provision for double liability in certain cases, the courts recognized that the situation had changed. It was now plain that the companies were contemplating exceptional conditions as the ground for exceptional liability, and this fact very properly influenced the construction of clauses calling for a double payment. An example is found in Ætna Ins. Co. v. Vandecar, 86 Fed. 282, 30 C. C. A. 48. In that case the Court of Appeals of the Eighth Circuit decided that the provision for double indemnity, if the insured should be injured while "riding as a passenger in a passenger conveyance," impliedly forbade recovery where the assured was injured while riding on the platform of a railway car. The force of the decision is weakened by the dissent of Judge Thayer, who agreed with the ruling of the Circuit Court that the assured was entitled to the double indemnity although he was not actually inside the car when he was injured. The majority opinion gives this reason for the court's conclusion (page 289 of 86 Fed., page 55 of 30 C. C. A.):

"They (the parties) evidently meant to stipulate for the double indemnity while the insured was riding in an exceptionally safe place. One who rides

as a passenger in a passenger conveyance using steam occupies such a place. But one who rides on, but not in, such a conveyance, whether on the platform or on the top of the car, or on the machinery beneath it, occupies a very dangerous place, and the parties neither agreed by the terms of their contract, nor intended to agree, that this double indemnity should be paid to one who rode in such a position. * * * The place specified in the contract—'in a passenger conveyance'—is a place of little or no danger, and the risk assumed is slight, while on the platform of a conveyance using the motive power described in the contract, and especially, as in this case, on the platform of a railway car, is an exceedingly dangerous place, when the train to which the car is attached is in motion."

In Van Bokkelen v. Insurance Co., 34 App. Div. 399, 54 N. Y. Supp. 307, in which the question was again the company's liability for double indemnity if the insured should be injured while "riding as a passenger in any passenger conveyance," it was held by the Appellate Division of the Supreme Court that such indemnity could not be recovered where the insured was killed while riding on the uninclosed platform of a railroad car. In accord with the reasoning in Vandecar's Case, the court say (page 402 of 34 App. Div., page 310 of 54 N. Y. Supp.):

"The defendant was willing to double its liability in case the deceased should sustain injuries when in a particular place, surrounded by such safeguards that there would be less probability of injury. It is quite apparent that a passenger upon a railroad train is much less exposed to accident when in the car than when approaching the car or upon the platform, either entering or alighting from it. Many cases have commented upon the fact that a platform of a car in motion is not a safe place for a passenger to ride. Many things are liable to happen to a train in motion, exposing a passenger on a platform to danger to which he would not be exposed if in the car. And this defendant had a right to limit its liability to pay double the amount to the beneficiary when death resulted from injuries in a case where, from the position of the insured, he would be comparatively safe, and the probability of his sustaining injuries under the circumstances quite remote."

So, also, in Anable v. Fidelity Co., 73 N. J. Law, 320, 63 Atl. 92, the double indemnity clause was again considered. The policy provided for such indemnity if the assured should be injured while "riding as a passenger in or on a public conveyance," and the facts were that the assured had left the car temporarily to buy a newspaper, that the train had started during his absence, and that he was fatally injured while attempting to regain his place on board. Essentially the case presented the situation upon which Judge Drummond ruled in Tooley v. Assurance Co., supra, but with the important difference that he was considering a contract of single, and general, liability, while the Supreme Court of New Jersey was construing a contract of double, and special, liability. The Supreme Court held that the assured was neither in nor on a public conveyance, saying:

"A passenger in a public conveyance, who keeps himself within a car or on a steamboat, is regarded as subjected to the slightest risk; while the act of getting on or off moving trains involves a considerable degree of peril. It was therefore obviously far from the intention of the parties to this contract that a passenger on a railroad train should get off the car at one station to buy a paper and then run for the moving train, could get off at another station to speak to a friend on the platform, and at still another station to buy fruit, and so repeat his exits from the car at various stations and repeat his race for the moving train, and yet all this time remain covered by double

insurance. * * * By the words of the contract, the assured was not doubly assured merely because he was traveling as a passenger, but only while riding as a passenger in or on a public conveyance. He was not so riding when injured."

Opposed to these cases is King v. Insurance Co., 101 Ga. 64, 28 S. E. 661, 65 Am. St. Rep. 288, where the company agreed to pay a double indemnity if the insured should be injured while "riding as a passenger in any passenger conveyance," and it was decided by the Supreme Court of Georgia that the insured was entitled to recover such indemnity although he was injured while attempting to alight from a moving street car. The court gave these reasons for the decision:

"A person may be said to be traveling in a carriage while alighting therefrom, until he has completely disconnected himself and alighted. 2 May on Insurance, § 524. There being nothing in the policy requiring a different construction to be placed upon the words, it is reasonable to hold that the insured was protected against all injuries caused by accidental means from the moment that he entered the conveyance until he had alighted therefrom. During this entire period he was riding as a passenger in the conveyance. This interpretation is required by the rule that requires words to be given their usual and ordinary meaning."

While the foregoing cases cannot be fully reconciled, I think it may fairly be said, as already suggested, that the differences among them may be explained by the considerations to which I have referred. The disposition of the courts to construe accident policies against the companies remains, even where the clause under consideration provides for double indemnity. But in that event it is ordinarily presumed that the parties had a special risk in view, and the construction will endeavor to carry out their intention. If the language, however, is fairly capable of a construction favorable to the insured, this will be given, although the clause provides for double indemnity. Thus, in Preferred Accident Ins. Co. v. Muir, 126 Fed. 926, 61 C. C. A. 456, a case decided in this circuit, the insured was fatally injured by being thrown from the platform of a rapidly moving car, but it was held by the Court of Appeals that double indemnity could be recovered under a clause providing therefor if the insured should be injured while riding as a passenger in "or on" a public conveyance, the ground for the decision being that the court was not at liberty to say that, when the stipulation reads in "or on" a public conveyance, this means inside a railroad car.

On the whole, therefore, it seems to me that, since the question of double indemnity is not presented by the present controversy, I am at liberty to adopt what appears to be a reasonable construction of the language used by the policy in suit, and to hold that a flexible and not a rigid meaning should be attached to the words, "while in a passenger elevator." In my opinion, these words cover such a situation as is presented by the facts in proof.

2. But I do not think that the plaintiff is entitled to recover the full sum for which the verdict was rendered. The policy has some unusual features. The main agreement was for the benefit of Sarah M. Hope, and insured Arthur Depue against "bodily injury and disability as

specified in the following schedules." These schedules begin by explaining what the extreme limit of the company's liability is to be:

"The principal sum of this policy in the first year is $5,000, with 5% increase annually for ten years (afterwards changed to 10% annually for five years) will amount to $7,500. Each consecutive full year's renewal of this policy shall add 5% (afterwards 10%) to the principal sum of the first year, until such additions shall amount to 50%, and thenceforth, so long as this policy is maintained in force, the insurance shall be for the original sums plus the accumulations."

It is clear, therefore, from this provision, that the "principal sum" was expected to increase as the policy grew older, until the end of the fifth year, and that it was always to be "the original sums plus the accumulations." On the same day when the main agreement was made, a supplemental agreement was entered into and attached to the policy as a rider, under which Sarah M. Hope was also insured. This was called the "beneficiary supplement," and is the agreement under which the present suit is brought. It differs from the agreement under which Arthur Depue was insured in several particulars, among others, in the amount that is recoverable thereunder. It insured Mrs. Hope "as specified in the following schedule," but limits the amount to $5,000. This, I think, appears plainly from the facts that the agreement goes on to say that "the original principal sum of policy to which this supplement is attached is $5,000," and that the schedule of indemnities in effect repeats this statement by providing that the company will pay for loss of her life "the original principal sum." In the face of this language, it seems to me that there is no room for discussion, and therefore that the verdict is too large. But, as the jury authorized the court to reduce it if such reduction should seem to be proper, judgment may be entered for $5,000, with the proper interest.

3. The motion for a new trial only needs a few words. The suit was prematurely brought, unless the company waived its right to insist on a delay of three months after the home office should receive the proof of death. This right was given by the policy—"No legal proceeding for a recovery hereunder shall be brought within three months after receipt of proof at the home office of the company"— but that such a right is waived by a denial of liability is undoubted. In support of the motion it is argued that the evidence upon this point should not have been submitted to the jury; in other words, that there was no evidence to support the conclusion that the defendant had wholly refused to pay, and had put its refusal on the ground that upon the facts there was no liability at all for Mrs. Hope's death. It is true that the evidence was not as full as might have been desirable— this was probably my fault in part, for I excluded the testimony of one of the plaintiff's witnesses upon this point as superfluous, because at that time I did not understand that the company was disputing the fact that it had wholly refused to pay—but there was certainly some evidence of refusal, both positive and negative, sufficient, I think, to require its submission, and I entertain no doubt that the jury reached the right conclusion when they came to consider it. The motion for a new trial is overruled.

The motion for judgment notwithstanding the verdict is also overruled, and judgment is directed in favor of the plaintiff for $5,000, with interest from March 2, 1908. To this order of the court an exception is sealed in favor of the defendant.